IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| MARK ANTHONY MARINER, #367-036 | * | |
| Plaintiff | * | |
| v. | * | Civil Action No. GLR-14-214 |
| CORRECTIONAL MEDICAL SERVICE, et al. | * | |
| Defendants | * | |

\*\*\*

## MEMORANDUM OPINION

This matter arises out of Defendants' alleged failure to treat Plaintiff's psoriasis of his skin and scalp. After Plaintiff filed suit on January 24, 2014 (ECF 1) requesting injunctive relief, he filed an Amended Complaint on February 7, 2014 (ECF 4). The Court then issued an Order directing Defendants to show cause why Plaintiff's request for injunctive relief should not be granted (ECF 6). On March 20, 2014, this Court construed Defendants' Response to Show Cause Order and Motion for Summary Judgment (ECF 14) as a Motion for Summary Judgment and granted Plaintiff 21 days to reply (ECF 15). Plaintiff filed a Motion for Summary Judgment (ECF 16) which is opposed by Defendants (ECF 19). Plaintiff opposes Defendants' Motion for Summary Judgment (ECF 22 and 23). Also pending is Plaintiff's Motion for Appointment of Counsel. ECF 17. No hearing is required. See Local Rule 105.6 (D. Md. 2011). For the reasons that follow, Defendants' Motion will be granted and Plaintiff's Motions will be denied.

### Plaintiff's Allegations

Plaintiff Mark Anthony Mariner is an inmate incarcerated at Maryland Correctional Training Center ("MCTC"). He claims that medical staff at MCTC are not properly treating his psoriasis of the skin and scalp. When Plaintiff arrived at Maryland Reception Diagnostic

Classification Center ("MRDCC") on November 2013, he allegedly was prescribed Fluocinonide Cream and the following month was provided A & D ointment to treat the itching. Plaintiff claims he was told he would be scheduled to be seen in the chronic care clinic, but he was not called to the infirmary until January 17, 2014, when he was provided hydrocortisone cream. ECF 1.  Plaintiff also claims his mental health issues are not being treated properly, but does not provide details regarding this claim. Id.  He claims his condition has worsened and has spread over his whole body. ECF 4 at p. 3.  As relief he seeks unspecified damages and an injunction requiring medical treatment. Id.

In a supplemental Complaint, Plaintiff asserts that Dr. Nimely saw him on February 25, 2014, and prescribed two types of lotion and shampoo.  He further claims that it took a total of fifty seven days to receive this treatment. ECF 10.

**Defendants' Allegations**

Defendants assert that when Plaintiff was transferred to MCTC from MRDCC, there was no recorded information indicating he suffered from a chronic medical problem or that he had raised any complaints about psoriasis. ECF 14 at Ex. 1, pp. 74 – 75.  Plaintiff also did not inform medical staff he was currently using any prescription medications to treat the psoriasis when he arrived at MRDCC. Id. at pp. 2 – 3; 74 – 75.  The medications he reported taking were Prozac, Doxepin, Amoxicillin, and Guaifenesin,[1] none of which are used to treat psoriasis. Id.

During Plaintiff's initial mental health screening he reported to Anita Olthof (Licensed Clinical Professional Counselor or "LCPC") that he had been treated for psychiatric issues through a family doctor since 2008.  He was referred for a psychiatric review of his medications

---

[1] Prozac and Doxepin are anti-depressants; Amoxicillin is an antibiotic; and Guaifenesin is used to relieve symptoms of cough and mucus in the chest. ECF 14 at Memorandum, p. 4, n. 2 – 6.

and was told how to access mental health services within the prison system. ECF 14 at Ex. 1, pp. 2 – 3; 74 – 75.

On November 11, 2013, Plaintiff saw Dr. Getnet Luka at MRDCC for tuberculosis testing and clearance for work assignment. Id. at pp. 62 and 73. Additionally, nurse practitioner Roslyn DeShields prescribed Plaintiff Fluocinonide ointment for psoriasis. Id. at p. 62. The records reflect that Plaintiff received the ointment the following day to "keep on person." Id. at p. 77 and Ex. 2. On November 20, 2013, Plaintiff sent in a sick call slip requesting reading glasses and complaining of psoriasis on his skin and scalp. ECF 14 at Ex. 1, pp. 28 – 29. Although Plaintiff was seen again for a scheduled sick call visit on November 21, 2013, he did not voice any complaints regarding psoriasis. Rather, he simply asked for reading glasses and was scheduled for an optometry consultation. Id. at p. 4.

On December 2, 2013, Plaintiff received more Fluocinonide ointment. Id. at p. 81. On December 11, 2013, Plaintiff was seen by Nurse Cletus Agha in response to a sick call slip requesting antifungal cream for jock itch and itching sensations on his feet. Id. at pp. 5 – 7. Plaintiff was issued Miconazole 2% cream for the fungal infections. Additionally, Plaintiff requested A&D ointment and Agha notified Nurse Practitioner DeShields, who ordered the ointment, as well as Tolnaftate the same day. Id. Plaintiff received the A&D ointment the next day. Id. at p. 79. On December 16, 2013, Plaintiff received a third tube of Fluocinonide cream and the antifungal cream that was ordered previously. Id.

On December 17, 2013, Plaintiff was scheduled for transfer from MRDCC to MCTC and an Intrasystem Transfer Summary was prepared, listing his current active prescriptions: Fluocinonide cream, Miconazole cream and A&D ointment. Id. at p. 8. All outstanding appointments and chronic care clinics had been scheduled as needed and Plaintiff was referred to

a provider for review of current treatments. Additionally, Plaintiff was referred to a Behavioral Health provider. Id.

On December 24, 2013, after arriving at MCTC, Plaintiff submitted a sick call slip complaining of psoriasis on his skin and scalp. He requested lotion for dry skin. Id. at p. 31. The following day he was seen by Nurse Anthony Moriarity, whom Plaintiff told that the treatments for his psoriasis were not working. Id. at pp. 9 – 11. Upon examination, small rough patches were noted on Plaintiff's body, but there was no evidence of infection or acute distress. Id. Plaintiff was referred to the nurse practitioner for further treatment of psoriasis and advised to increase his fluid intake. Additionally, Plaintiff was told to follow up if his condition worsened or did not improve. Id.

On January 2, 2014, Plaintiff submitted a sick call slip requesting refills of Fluocinonide cream and A&D ointment. Id. at p. 33. He also informed staff that the Fluocinonide expired as of January 2014 and the A&D ointment was due to expire in February 2014. Id. Plaintiff was scheduled to be seen in response to his sick call slip on January 8, 2014, by Physician's Assistant Richard Sampong, but Plaintiff was not seen because he was away from MCTC for a court appearance. Id. at p. 12.

On January 16, 2014, Plaintiff submitted an emergency sick call slip stating he had been seen on December 25, 2013, for psoriasis, but had not been seen by a provider despite having passes to see a Physician's Assistant on January 15, 2014. Id. at pp. 37 – 38. He also reported that he was using the A&D ointment within seven to ten days per tube and needed a moisturizing soap or lotion as well as dandruff shampoo. Id. He was seen the following day by Nurse Elizabeth Barr and was referred to a provider for ongoing worsening psoriasis which was not responding to treatment. Id. at pp. 13 – 14.

Plaintiff's prescription for Fluocinonide cream was reordered through May 20, 2014, on January 20, 2014. Id. at p. 15. He was scheduled for a medical visit on January 21, 2014, but could not attend due to a court appearance. Id. at p. 16. On January 23, 2014, Plaintiff submitted another sick call slip to refill his psoriasis medication and to reschedule his missed appointment. Id. at p. 40. Plaintiff received one tube each of Fluocinonide and A&D ointment on January 26, 2014. Id. at p. 87. Two additional tubes were dispensed later that month. Id.

On January 27, 2014, Plaintiff submitted another sick call slip as a complaint that it has been more than 30 days since his original sick call slip of December 25, 2013, seeking an evaluation. He further stated that the itching was so bad that he was scratching his skin off, causing scabs, and that the topical treatments he was receiving were ineffective. Id. at pp. 41 – 42. He was scheduled for a nurse sick call on January 28, 2014, and was seen that day by Nurse Marion Diaz. Id. at pp. 17 – 18. He was provided medi-cortisone 1% to be used with existing prescribed creams. Id.

On January 30, 2014, Plaintiff submitted another emergency sick call slip claiming he had not been seen by a doctor or PA for his psoriasis since December 25, 2013. Id. at pp. 44 – 45. He requested lotion, soap, and shampoo for his condition and stated he had a pass to see a PA but was not seen at all. Id. On February 4, 2014, Plaintiff was again seen by a nurse and the medi-cortisone was reordered. Id. at pp. 19 – 20. He was again advised to increase his fluid intake, refrain from scratching, and to put in another sick call if symptoms worsened or did not subside. Id.

At an appointment on February 6, 2014, with Nurse Jonathan Ford, Plaintiff voiced no complaints about psoriasis. Id. at p. 21. He received refills on the three creams provided to him previously on February 9, 2014. Id. at p. 47. Two days later Plaintiff renewed his request for

reading glasses and made no mention of psoriasis. Id. at pp. 48 – 49. On February 12, 2014, Plaintiff refused to be seen in response to his sick call slip and signed a release of responsibility. Id. at pp. 50 – 51.

On February 21, 2014, Plaintiff was seen by Dr. Contah Nimely in a chronic care visit for skin irritation. Id. at pp. 22 – 23. Plaintiff told Nimely that he was suffering from itchy, scaley skin on his scalp, face, back, chest, and upper and lower extremities and that his skin worsened in the winter. He further advised he had suffered from psoriasis his whole life. On examination Nimely noted lesions which were patchy, red and of varied shapes covering more than 20% of Plaintiff's body. Nimely diagnosed Plaintiff with moderate psoriasis and provided him with a plan of care which included daily moisturizing, "continuation of high potency topical steroid-pulse therapy,"[2] and sulfur shampoo for use every other day as needed. Nimely further advised Plaintiff to return in one month if there was no improvement and systemic treatment would be considered at that time. Plaintiff was also put into the chronic care clinic for general medicine for treatment of his psoriasis. Id. at pp. 22 – 23. Thereafter, Plaintiff declined to attend a scheduled medical visit on February 27, 2014, and signed a release of responsibility. Id. at p. 71. The following day Plaintiff submitted a sick call request seeking a refill of A&D ointment because he never received the refill put in on February 24, 2014. Id. at p. 53.

**Plaintiff's Motion for Summary Judgment**

Plaintiff claims the only treatment he received for psoriasis was from the staff at MRDCC and that he did not receive treatment at MCTC until he filed the instant Complaint. He states he was not given hydrocortisone cream until the third time he was seen by a nurse at MCTC after his psoriasis worsened, covering his face and head. He alleges the condition was so bad he had to wear a hat. ECF 16 at pp. 1 – 2. He admits he was seen by Dr. Nimely on February 21, 2014,

---

[2] Defendants do not define this term.

who recognized how bad his condition was when she noted it covered 20% of his body. He claims that his condition deteriorated because of medical staff's refusal to treat him. Id. at p. 2. He further alleges that the only medical appointments he declined were appointments for eye glasses. Id. at p. 3. He states that his missed appointments for court appearances should have been rescheduled, but were not and caused a 57-day delay before he was seen by a doctor. Id. at p. 4.

**Standard of Review**

    A.  Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a), which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002). The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." Bouchat, 346 F.3d at 526 (internal quotation marks omitted) (quoting Drewitt v. Pratt, 999 F.2d 774, 778-79 (4th Cir. 1993)).

    B. Eighth Amendment Claim

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. Gregg v. Georgia, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." De'Lonta v. Angelone, 330 F.3d 630, 633 (4th Cir. 2003) (citing Wilson v. Seiter, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. See Estelle v. Gamble, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. See Farmer, 511 U.S. at 839-40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." Rich v. Bruce, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness

on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844).  If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." Farmer, 511 U.S. at 844.  Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  See Brown v. Harris, 240 F.3d 383, 390 (4th Cir. 2000) (citing Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998)) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

    C.  Injunctive Relief

A preliminary injunction is an extraordinary and drastic remedy.  See Munaf v. Geren, 553 U.S. 674, 689-90 (2008).  To obtain a preliminary injunction, a movant must demonstrate: 1) that he is likely to succeed on the merits; 2) that he is likely to suffer irreparable harm in the absence of preliminary relief; 3) that the balance of equities tips in his favor; and 4) that an injunction is in the public interest.  See Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S. Ct. 365, 374 (2008); The Real Truth About Obama, Inc. v. Fed. Election Comm'n, 575 F.3d 342, 346 (4th Cir. 2009), vacated on other grounds by 559 U.S. 1089 (2010), reinstated in relevant part on remand, 607 F.3d 355 (4th Cir. 2010) (per curiam).

**Analysis**

It is clear from the records submitted that Plaintiff was treated at MCTC, but was not seen by a doctor until February of 2014.  His assertion that nothing was done when he was seen by other medical staff prior to being seen by Dr. Nimely is disproved by the medical records, which he does not dispute.  To the extent that Plaintiff simply believes that "medical treatment"

is only that which is provided by a doctor, he is mistaken. Plaintiff's disagreement with the approach to have patients initially evaluated by nursing staff is simply not a basis for an Eighth Amendment claim. Indeed, when Plaintiff was seen by Dr. Nimely, the course of treatment prescribed by nursing staff was continued. Thus, it does not appear that his condition was left untreated or was treated inappropriately. Additionally, Plaintiff admits he is receiving treatment for his condition, obviating the need for injunctive relief from this Court. Accordingly, Plaintiff's Motion for Summary Judgment shall be denied and judgment shall be entered in favor of Defendants by separate Order which follows.

June 27, 2014

                                                 /s/
                                      George L. Russell, III
                                      United States District Judge